Reynolds v Kiyos, case number 25-1133. Good morning. Good morning, Your Honors. And may it please the Court, my name is James Bell Forty. I'm an assistant attorney general for the State of Connecticut, and I represent the defendants in this case. Qualified immunity isn't just immunity from damages. It's immunity from suit. And it's effectively lost if State officials are forced to go to trial to defend against insubstantial claims. And insubstantial claims are all that remain here after the first trial, because there are no cases from this Court or the Supreme Court holding that officials facing similar factual circumstances and taking the same or similar actions as my clients did violated the Constitution. As the Supreme Court held just two months ago, officers receive qualified immunity unless they could have read the relevant precedent beforehand and known that it prescribed their specific conduct. And beyond this, this Court's held and the Supreme Court's held, it's not just that they have to know it. They would have to know it for certain. And it's not just any officer. It's every reasonable officer in those same factual circumstances. No such precedent exists here, and there is certainly no precedent holding, as the District Court did, that the plaintiff had a clearly established right to, quote, minimal human contact and environmental stimuli, unquote. The Supreme Court has never held that. There are cases from this Court that cut squarely against this newly created right, cases like Baltus and Good, that the District Court didn't address. And there are cases from the Third, Fourth, Seventh, Ninth, and Tenth Circuits that have either rejected similar solitary confinement claims or granted qualified immunity to prison officials in cases released after the relevant liability period here. As for procedural due process, no decision of this Court or the Supreme Court has held that when a correctional official reasonably believes a State statute requires him to keep an inmate on certain conditions of confinement or in a certain status, he violates the Constitution by having regular reviews of that status but having the reviews not be capable of releasing the person from said status. Well, doesn't the statute provide for regular review, right? The statute provides for regular review, Your Honor. Well, then they didn't give him one. They made a blanket order that he was to be in the maximum secure detention. Well, Your Honor, two things to that. They did give him the regular reviews. He got the regular reviews. It just said he wasn't able to get off of the status, and that's because the statute itself meant — Was he eligible to go into ad sec, administrative segregation? He was eligible to go on administrative segregation, which is a more restrictive But for the order of the superintendent, which said, no, anyone who previously was sentenced to death must be held at the highest level of security. Well, Your Honor — That doesn't sound like a meaningful review to me. Well, Your Honor, I think the bigger issue with the procedural due process claim is whether or not there's a liberty interest in the first place. There's no liberty interest — Well, the statute provides for a regular review. Yes, but the statute doesn't provide for release from the conditions of confinement or release from that status. Well, aren't there sub-conditions within the maximum level of confinement with regard to, like, being shackled and limited contact, things like that? There are requirements in the statute that say that he has to be escorted, that he get no more than — I shouldn't say he. Anyone who is on the status, special circumstances, can't get more than two hours of recreation a day, has to be moved out of his cell, I think it's every 90 days, has to have his cell searched every two weeks, and has to be held on the — I think it's called the — as this Court held, frankly, in Reynolds 1, permanent and unreviewable isolation. That's how the Court ruled that this law was a bill of attainder in the first instance. Basically, adopting the same interpretation of the statute that my clients did and that the jury found they did in this case, which I think is dispositive on a qualified immunity issue, whether you look at it from a clearly established view, where you have, like, a Francis B. Fiaco situation where you're caught between a State statute being interpreted and something else. At least in Francis B. Fiaco, you actually had a court order. In this case, you have an interpretation of a State statute and nothing on the other side. Or if it's objectively reasonable, because as this Court held in Blumenthal v. Karate, if State officials are interpreting a presumptively valid State statute until the Court steps in and says that it's not a valid State statute, they are entitled to qualified immunity. They behave in an objectively reasonable manner. Here, this Court came up with the same interpretation of the statute, which was, these people are required to be held on special circumstances. They are not allowed to be released to general population. As my client, I'm sorry. No, there's no, no. This is, you're talking about C, right? Sub C? Yes, Your Honor. The commissioner shall place such inmate in a housing unit for the maximum security population. But that, but there are subcategories of that maximum security population, are there not? Your Honor, I think within.  Administrative segregation? Within admin seg, yes. But admin seg is, is a more restrictive standard of confinement than even special circumstances was. So the reading of the statute is, you can put him on a more restrictive status if that's necessary. But at the baseline, you have to keep him on special circumstances. What is the meaning of sub C? I don't understand it, then. It makes no sense to me, the way you're reading it. My. Let me, let's finish, let me finish for a second.  I'm not, I'm just trying to figure it out. I understand. The commissioner shall place in such inmate, that's an inmate who is, who previously was subject to a death penalty, the death penalty, correct? Yes, Your Honor. In a housing unit for maximum security population, which he was, but that, but which apparently has subcategories to it. If, after completion of such a reclassification process, so he's supposed to be reclassified, the commissioner determines such placement is appropriate, provided the commissioner, A, maintains the inmate on special circumstances, high security status, house the inmate separate from others, was not special circumstance, high security, imposes conditions of confinement on such an inmate, which shall include, but not be limited to, and then it lists six. And he, he imposed all of them, did he not? Yes, Your Honor. Doesn't require him to do that. I believe it does. Shall include, but not be limited to. In other words, has to have these, you can add additional things onto it as well. And again, I, I, I, I think the court's ruling in Reynolds, in the earlier version of this case, where the court held that in order to find a bill of attainder, the quote is, Section 1810B thus compels a form of severe confinement that was not available to anyone at the time of Reynolds' offense, namely confinement in indefinite and unreviewable isolation without the possibility that Reynolds could ever be housed in the general prison population. That's how this court read that statute. We put a special interrogatory to the jury about whether or not my clients reasonably believed that the statute required them to keep Mr. Reynolds on these conditions and they answered yes. That wasn't even addressed by the district court in this case. And so ultimately, whether you look at it as objectively reasonable or clearly established, there's really no question that they could, sorry. What then happens to sub two? The commissioner shall conduct an annual review of such inmates' conditions of confinement within such housing unit. The commissioner shall name five prevailing threshold measure or safety reasons to modify any condition of confinement. I think that's a grant of potential discretion with that same baseline. Subject to the restrictions. Subject to the restrictions. So in other words, if the commissioner feels in his discretion based on this that something should be modified or something should be included or added on to it, he can do that. But it's certainly not a requirement that he do. It's certainly not a liberty interest or an expectation or anything more than a unilateral expectation on behalf of the plaintiff in a case like this. And I think that's the problem with the lack of the mandatory language, frankly, that would give someone more than a unilateral expectation. Without that mandatory language, it's not clearly established that you have a liberty interest in the first place. In cases like Proctor, for example, don't even touch on the liberty interest because there's no discussion of mandatory language because SH, sorry. This is out the window now because of the bill of tenure, right? Yes, sir. So we're only talking about 2017 and 2019? We're talking about 2017 to 2019 and the remaining damages. He's been off the status since 2021. He's been out of, Northern's been closed for years at this point. He's actually in the general population now, right? Yes. I'm not sure if he's on general population. He got into some additional trouble that was subject to a different appeal that we had in this case. I'm not sure what his status is right now, but he may be. All right. Thank you.  Good morning, and may it please the court. My name is Tyler Finn, and I'm here on behalf of plaintiff Kelly Richard Reynolds. The defendant's appeal here is premature. There is still no final judgment in this case, even though Richard Reynolds filed this lawsuit in 2013. Now, the last time this case was on appeal in 2021, this court held that the parties vigorously disagree as to the precise conditions imposed in the special circumstances unit in which Reynolds is housed. It's page 294 of the opinion, and those same factual disagreements persist to this day, even after the first trial. Well, from a qualified immunity standpoint, can't we simply look at the evidence that you presented and make a conclusion based upon that factual record as to whether the defendants are entitled to qualified immunity? Yes, and if those facts most favorable to the plaintiff, to Mr. Reynolds, the district court found the jury might find are accepted as part of the record, then qualified immunity should be denied. You look at the full universe of facts, which includes facts about the squalid conditions in the cells at Northern. So then we get to the conditions of confinement. Correct. From 2017 to 2019. The Eighth Amendment claim actually has a longer time period. That's from 2010 to 2011. The whole period. The whole period, yeah. And I would point to the 2013 case from this court in Walker v. Schultz, which is cited throughout the party's papers, which talks about how unsanitary conditions, exposure to extreme temperatures, and conditions of noise that limits sleep are potentially alone or in combination could violate the Eighth Amendment. But your trial evidence, am I diminishing this? You know, we've seen some of these cases. Is it your client indicated that he slept up to 11 or 12 hours a day? Your Honor, respectfully, I think that's taking the trial evidence out of context. You heard evidence from both Mr. Reynolds and from Eduardo Santiago, another inmate on Northern who was there for a long period of time, around the same time period, that there was noise, banging, yelling, screaming of inmates going on from 3 or 4 in the morning pretty much all of the time. And what Mr. Reynolds testified is that he wouldn't be able to sleep until 3 or 4 in the morning at most times. And the testimony, which I think is the most relevant here on 345 of the joint appendix on cross-examination, is explaining, I believe the way I explained it is you get as much sleep as you can, you can take it. So if it's not too noisy, I could sleep for 12 hours, I'd sleep for the 12 hours. But the point being, for years, there was plaguing noise coming from mentally distraught inmates from the banging of doors every 15 minutes that prevented any kind of uninterrupted sleep. And the testimony that Mr. Reynolds gave at trial is that when the rare opportunities, he had the opportunity to sleep, he would take it. But if you look at the conditions in combination, again, temperatures, the noise in which we heard testimony from several witnesses, in combination with social isolation, I think the right was defined with reasonable particularity by the Walker v. Schultz case in 2013 to deny qualified immunity in this case. Because the question before the court in terms of qualified immunity is whether the right was defined with reasonable clarity. That comes from the NRA v. Vulo case from last year in this court. And again, given the conditions, although they might be factually distinct from a case like Walker, noise, sleep, extreme temperatures have been held to violate the Eighth Amendment in certain cases. And that put defendants on notice officially here. I'm going to move on to the issue of due process here. That would be helpful. Yeah. In this case, there really aren't too many factual disputes relevant to the claim. The jury resolved those factual disputes in Mr. Reynolds' favor with their verdict. And it's also undisputed, as was alluded to earlier, that Mr. Reynolds was not afforded any constitutionally meaningful process with respect to the conditions of his confinement after he was resentenced from death to life without the possibility of release in April of 2017. Now, instead of completing the required reclassification process, which is mandated by statute, by Connecticut General Statute 1810b, what defendants did is amend their internal classification directive so that anyone in Mr. Reynolds' position, anyone who was sentenced to death, had their sentence vacated or commuted, would automatically be assigned to a Level V and automatically be assigned to the special circumstances, high security status, and all the restrictive conditions that went along with that. And because that classification process became automatic, the outcome of any such review was preordained. It was basically meaningless paper-pushing, which is not a sufficient process under this Court's precedent. And I'll point to Proctor v. Leclerc from 2017, which said, whenever a process is constitutionally due, no matter the context, it has to be done in a meaningful time and a meaningful manner, and that review with a preordained outcome is tantamount to no review at all. And that is the kind of process, if you want to call it that, that Mr. Reynolds received here. Because the result of those reviews were preordained by defendants' amendment to their classification directive. So... What's your argument about the language of Section Sub C? So... The State contends that that requires, that the statute required them to do it. So Section Sub C requires that an inmate in Mr. Reynolds' position only be placed in the maximum security population, I'm reading from C1, if, after completion of such reclassification process, referring to the classification process in Subsection B, which requires an assessment of the risk of the inmate, meaning an individualized assessment of that inmate's risk to staff and other inmates, only if, after that mandatory process, and the Commissioner makes a determination that placement in maximum security population is appropriate, do the rest of the conditions in C1 apply. And Mr. Reynolds never received that initial mandatory reclassification process, in any meaningful sense, after resentencing, in light of defendants' amendment to their classification directives. And that's what the District Court, how the District Court interpreted the statute here as well. Placement in special circumstances is only appropriate after the Commissioner so determines in a reclassification process. So this statute did provide Richard Reynolds with a liberty interest in having a meaningful classification process that he was denied. And, moreover, as was discussed earlier, Section C2, even assuming that the statute does mandate placement in special circumstances high security status, Section C2 mandates an annual review of such conditions of confinement and empowers the Commissioner to modify any condition of confinement subject to certain limitations for compelling correctional management reasons. That review did not occur earlier. And, again, even if this Court were to interpret the statute as mandating those conditions for all prisoners in Mr. Reynolds' situation, he still had a liberty interest in having a meaningful review about his conditions of confinement. The liberty interest is the meaningful review. Correct. And just to clarify, there are certainly some very restrictive conditions mandated in C1, but what defendants, how defendants confined Mr. Reynolds went far beyond what is mandated by the statute. This was a... When you say, I'm sorry, now, when you say far beyond, all you've said is a failure to conduct an annual review. I mean the conditions that were imposed. Even if you look at the conditions that were outlined in the statute, such as no contact visits, maximum of two hours of recreation. There was evidence at trial from former Commissioner Leo Arnone at Joint Appendix 665-666, clarifying that this statute didn't mandate a certain amount of in-cell time. And Mr. Reynolds was held at all relevant times for 22 hours a day in his cell, except on Sundays when he was held for 24 hours. The statute didn't mandate the amount of time spent in cell. It put a limit on recreation, for sure. It did not place a limit on congregate religious activities, on educational opportunities, on work opportunities. So even within the confines of the statute, defendants could have given Mr. Reynolds significantly more out-of-cell time. And if they did not do that, this review in C2 would have permitted such. I guess my question is, just as a matter of qualified unity, your friend from the AG's office, Mr. Laporte, says that there is no clearly established law. In fact, maybe it's clearly established, still in the other way, that you've got a liberty interest in the way that you just described, that would allow you to have, or that would prevent or prohibit the Commissioner from placing someone on special circumstances in a high-security status in confinement for 22 hours. There is, Your Honor. We'd point to Wilkinson v. Austin. That's the one. That's what you're relying on. Correct. Because those conditions in terms of the atypicality and significance as compared to the ordinary instance of prison life is one of the tasks to determine whether a liberty interest is due. Those conditions were broadly similar to the ones at issue here. In terms of in-cell time, prohibition of contact visits, and lack of educational and work opportunities outside the cell, those conditions were held by unanimous Supreme Court to trigger a liberty interest. And defendants should have been on notice here that such conditions triggered a liberty interest. And I'll just add, there's a whole line of Second Circuit cases, beginning with Cologne v. Howard, Walsh v. Bartlett, which hold that more than 305 days in segregated housing is sufficient to trigger a liberty interest. And here, it's a far cry from 305 days. We have 25 years in these conditions. So you're saying in combination of Wilkinson, Cologne, and then two on the other side, Proctor, those are all the basis for this claim? Correct. Those conditions should have put defendants on notice that given the severity and the duration of the conditions imposed at Northern that Mr. Reynolds had a liberty interest, especially in combination with the clear directives of Section 1810b, which mandated a classification process. Thank you very much. Thank you. Your Honors, I want to get into the Eighth Amendment factual questions, but real quick on the due process claim. You don't have a liberty interest for mandatory language in a process. You have it in to release from confinement. So quoting Baltus, You must establish that the State has granted its inmates by regulation or statute a protected liberty interest in remaining free from that confinement or restraint. The statute doesn't give you a liberty interest in a process. It gives you liberty interest in release. And this statute did not provide that. And the plaintiff's argument is relying on this idea that liberty interest is based totally on atypicality and significance, and ignoring the mandatory language. That's the whole point of our argument. Baltus requires that. That was required in Palmer. It was required in Frazier, in Welch. There's all kinds of cases across this Court's jurisprudence about that. Now, with regard to the factual issues on the Eighth Amendment, the plaintiff gets it wrong on the universal facts. So this Court — Well, once you say that — Yeah. Once I say that — Then you've got a problem. No. And this — Unqualified immunity. So, Your Honor, if I could finish. So the argument was there were contested facts below, so of course there are contested facts now. When we look at what the Court actually pointed to in contested facts in the earlier decision, there were two affidavits, one for Mr. Kuros, one for Mr. Robles. And every single one of those facts is articulated in footnotes 29 and 30 of the Court's decision. These facts were, one, whether or not they could talk to others in the inmates in the outdoor rec area. Plaintiff admitted that they could, Joint Appendix 314 and 315. Two, did they have social visits? Plaintiff had the opportunity for three social visits a week, over 150 social visits a year, Joint Appendix 338 to 340. Social phone calls. From 2009 until 2019, he had the ability to make at least two phone calls, and then a day, it moved up to six, and over the liability period, he had approximately 5,000 social telephone calls. Joint Appendix 335 to 338. You're saying none of these things are factually disputed? They're not disputed, because I asked him these on cross-examination, and he agreed with it. So it's kind of the opposite of Bryant v. Egan, where Bryant v. Egan was, well, you didn't bring up qualified. You said it was that you couldn't decide qualified immunity on a summary judgment, and now we've gotten rid of the verdict, so now we'll just proceed to another trial. Here, we proceed to a trial because the plaintiff had created factual disputes. We probed those factual disputes. He acknowledged all of them, volunteered some of them. And at this point, now there are no factual disputes. And when it comes to things like sleep and everything, he volunteered. I did a lot of sleeping. There was no comment about rare opportunities to sleep. He said, I did a lot of sleeping. That was a question on direct. And when we talk about temperature, he didn't even bring up the temperature. The only temperature evidence we had was from a woman who had never met Mr. Reynolds, never gone into any of the cells, and said she found to be cold. That's not enough. And when you look at the Walker case, which was a motion to dismiss case, by the way, the allegations there are, in addition to that, there's going to be physical effects, like I can't breathe, it's so cold, or I can't sleep. And the sleep is having physical effects on me. We don't have any of that here. There are no issues in dispute, no facts in dispute. And the law is not clearly established. In fact, if it is, it's clearly established in our favor. Thank you, Your Honor. Thank you very much. We will observe decision. Thank you.